Good morning. May it please the court, my name is John Baker and I am here on behalf of my client, Candice McCurdy, asking you to reverse a grant of summary judgment that was entered in the district court. This is a 14th Amendment gender discrimination claim and it is one of the few, I think, that I've brought where we exclusively rely upon the ubiquitous McDonnell-Douglas burden-shifting method. And this case really tests the question of what constitutes sufficient evidence of pretext to create a triable issue for a jury. So who is a comparable person who gets treated better? Caleb Kraft. So why is he comparable given the fact that there are distinctions between the criminal records of his various family members, some of them were a long time ago, and perhaps most importantly, she comes after him. It seems to me they may have felt burned by this experience with Mr. Kraft and have thought we need to be more careful with who we put on this law enforcement group. And Judge Wood, you're right, they might have felt burned and they might have felt that that was a significant consideration. However, that's inconsistent with what they did with the person that they selected after my client, when they brought him in before they had conducted any sort of a background investigation. So if they had changed their policy, one would have expected that they would have followed through when they hired Mr. Notier right after Ms. McCurdy was not allowed to take the position. So I think that it becomes very challenging for them to argue, look, we were burned once, we were going to be a lot more careful here. The distinctions, I think, are significant when you look at the background of Mr. Kraft compared to the background of Ms. McCurdy. You have Caleb Kraft, who the background investigation is done by an independent wing of the Illinois State Police, all right? This is a division of internal investigations who does the background investigation. It's not these people who are making these decisions. Mr. Kraft goes through his background investigation and the background investigation says, don't hire him. He fails. He fails because of his relationships with his family members. Yeah, I know, I know. And then they hire him and then, of course, it turns out that was a bad idea. All right, so do you think it's unlawful for hiring agencies such as the SIEG to take into account the people with whom candidates associate? Do you think that's a problem in general, that they shouldn't have looked at Mr. Mulring at all or whether there was a relationship between? No, I think it was appropriate for them to look at that. So if that's appropriate, and I will certainly say from my own experience, that's a very common question. It is. If the FBI comes and talks to you about somebody or they want to know, you know, do you hang out with a bad crowd, basically. So they thought he was an undesirable person. So what I'm trying to figure out is whether that view, which doesn't seem to have much to do with gender, somehow shows that it's her gender, her sex, that's causing them not to hire her. Not just that they think rightly or wrongly that this group, the Weasels, who may just be a bunch of juvenile, you know, troublemakers, is a bad group. Well, and I guess, Judge Wood, to answer that question, you know, at the beginning I indicated we're relying strictly on McDonnell Douglas, which requires us to present evidence from which the jury could conclude that they were lying about their justification. It doesn't require us to present evidence of pretext plus evidence of discrimination. And so there is no direct evidence of discrimination here, or at least not enough, I think, to get us past summary judgment. The question becomes, though, taking a look at the record as a whole, could a jury look at what Fitz and Gill are saying and say, you know what, we don't believe that they are telling us the truth about why they made the decision that they made. And I think that there is sufficient evidence from which a jury can do that, drawing inferences in favor of my client. I mean, you have this question with Mr. Mooring. Number one, the matter should have been referred back to DII to investigate and do the background investigation. But we're not in that business, though. I mean, if they really thought that Mooring was a bad character, that's not discriminatory, is it? If they really believed it. The question is, can a jury conclude that that's not really the reason that they acted the way that they acted? And what's your best evidence that this was just a smokescreen? Well, I think, number one, you have all the hurdles that she had to go through throughout the process to begin with. But then you have... Did she have special hurdles? She went through the same hurdles everyone else does, correct? No, she did not. When everybody else, every other man who has ever gone into that job, there's never been a woman, every man who has gone into that job immediately was brought in to the position. She was not. She had to wait six months while her background investigation was being processed. So, no, there was a difference in the way that she was treated when she initially came in. You had Caleb Kraft, who failed his background investigation. Failed it. All right? And so we say, well, look, the problems with Mr. Mooring are significant. She didn't fail her background investigation. But they recommended that she be hired, right? Yes, they did. They did. And not only that, two levels above, Colonel Pickley, who was two layers above them, recommended that she be hired. So she didn't fail her background. Everybody said that she was honest along the way. And she was honest when she was talking to them about Mooring. And the other thing is there's no evidence that Mooring is even a bad guy. I mean, you know, you have these statements that are made that he's part of these weasels, but Mooring was a law enforcement officer at the time. And he was, and I believe still is, a sworn law enforcement officer. And this is what I think is disturbing. You know, they made this statement to her at the time. They said, you know, this is according to her testimony. They just stated that he was afraid that if I was involved with somebody like John Mooring, that I might say something that would jeopardize an investigation and put them or someone I was working with in harm's way. There is nothing at all in her background. She is an honorable law enforcement officer. There is nothing at all in her background that would suggest that she would do that. She had no criminal background. Mr. Kraft did have a criminal background. I don't think he did, but he was convicted of something, I believe. She did not have associates with people who had been convicted. Mr. Kraft did. Why weren't they concerned about Mr. Kraft sharing something with his family members,  But these are the problems. What you have is you have two people who are looked at very, very differently as they are going through this process. I'm not saying that this is the greatest case of discrimination that's ever come down. But what I am saying, there is sufficient evidence here from which a jury could look at this and find in favor of Candace McCurdy, which means it's not appropriate for a grant of summary judgment. That's all that we're saying, that this is the sort of thing where there are sufficient facts that a jury could say, hey, there's discrimination here. And that's, again, based on McDonnell Douglas. There's no direct evidence. I conceded that throughout. But there is evidence from which a jury could look at this and say, this is a problem. And that's really what my concern is, Judge Wood. I thank you, and I'll reserve the balance for my rebuttal. Thank you. If you want to save a minute for rebuttal, that's fine. Thank you. Mr. Bieschke. May it please the Court. My name is Frank Bieschke, and I represent defendants. David Fitz and Jeff Gill. This Court should affirm summary judgment in favor of defendants because plaintiff has not met her burden of producing sufficient evidence to permit a reasonable jury to find in her favor on each element of her discrimination claim. So she does have quite different treatment when it comes to the immediate starts, right? Because you can say, well, they let Kraft start right away pending the investigation. And I'm willing to imagine that maybe after Kraft turned out so badly, they were thinking maybe we shouldn't let people start before investigations are complete. But then it turns out that at least a jury might think that that's not true at all because the person who comes along after Ms. McCurdy gets started right away. So she stands out from the crowd as the only one who's not started in the face of at least no evidence that there's a problem with her, and she actually winds up being recommended for the job. It's a strange and troublesome situation. Well, Your Honor, with regard to the first allegation of discrimination, which is her inability to start working with the group during her background investigation. And it would have been a promotion, she alleges, that she would have earned somewhat more money in that position. Yes. So that's an adverse effect. Well, if she would have received additional pay during this interim period where she would have been allowed to work with the group and work in the office getting acclimated to the people, the paperwork, and things like that, she wouldn't at that point have yet been allowed to go out and engage in investigations. But she would have been getting more money. Well, there's no evidence that she would have received more money during that interim period. She says that she would have. Well, she testified that when asked if the position entailed a raise, she testified, I'm not sure exactly what our contract reads now because it may have changed since I was trying to get involved, but it would have been a promotion and considered part of the investigative unit, and I'm not sure how much more. I don't know if it was a couple thousand or whatever. That just goes to the issue of whether she would have ultimately received a raise had she become a member of the group. It doesn't address the question of the amount of money she would have been paid during this interim period where she isn't acting fully as a member of the group because she hasn't been granted inspector status. Wouldn't she have gotten back pay, retroactive pay, for the period where she started before she was cleared? If she was entitled to the higher pay during that interim period of time. But here there's no evidence one way or the other whether or not she would have received this indeterminate raise during that, I think it's about a three-month period, or whether she would have started receiving that salary after getting inspector status. The only evidence on the record about what happens during this interim period is that she would go to the office, she would get acclimated to the people and the paperwork and things like that, but she wouldn't be acting fully as a group member because she wouldn't have been undertaking investigations or anything of that matter. So this court does not actually even need to reach the issue of pretext as to this first allegation of discrimination because plaintiff hasn't met her burden of producing sufficient evidence of an adverse employment action during this intermediate period. But we also have some conflicts in the evidence about Mr. Thomas, right? Fitz says, you know, offers one reason for delaying her start and Thomas completely undermines that. Well, there's agreement on a lot of the facts. I mean, there's agreement that plaintiff, not all of them, but there is agreement that plaintiff was the evidence custodian, that plaintiff was going to need to oversee the transfer of evidence when they moved to the new jail. And why couldn't a reasonable jury think that your clients blew that up into something that Thomas himself, the best person to say so, never said? He just said, you know, there might be a day or two where we're going to need her help. I'm glad to work with people. You know, I think that's a problem. Well, again, Your Honor, even with this testimony regarding pretext, that doesn't change the initial adverse employment standard, which is that she needed to present evidence proving that she would have suffered some sort of a materially adverse result as a result of not being allowed to start early. Well, failure to get a promotion, even if it's something that has just a down-the-line economic impact, promotions are normally thought of as both prestigious as well as more remunerative, puts her on a different track. Yes, Your Honor, and that would go to the second claim of discrimination, as to the ultimate decision to recommend against her application. As to the first one, it's just that three-month period and whether or not she would have been paid more during that period, because she wouldn't have been able to engage in these kind of activities that perhaps would have looked good on her resume later on, because she wouldn't have been able to do these investigations until she was granted inspector status. So the entire basis for the adverse action on this first claim is just her testimony that she would have received a raise as a result of the new position and then, I guess, the assumption that she would have been paid more during that period. Is there some statute or regulation that we could look at to decide whether had she been given this advance assignment that would have included a raise? I don't believe so. If she says yes, you say no. Is it just a matter of say-so? Well, it's a matter of what's in the record, Your Honor. No, statutes and regulations. Well, right, statutes. Are there any statutes and regulations? No, not that I know of, Your Honor. As far as I understand it, whether or not somebody would have gotten paid during that period depends on each agency because the agency continues to pay the contract even after the employee moves to the group. And here there just isn't any evidence on the record to support the assumption that she would have been paid more. So why doesn't that make it a disputed fact then? It certainly seems material on the question whether there was an adverse employment action. Well, because there would have to be some evidence that she would have received this extra raise. And here there's just an absence. She so testified based on what had happened to others. She testified that the position held a raise, not that this indeterminate period. Well, she's not going to testify that I'm the only person who's not going to get it. I mean, surely that's not the position you want to take either. The first and only woman to take the position is the only one who doesn't get a raise? No, right, Your Honor. But her testimony just goes to what the position entails, and she had to present evidence showing that there would have been some adverse material change during this intermediate period of time. And as to the ultimate decision not to recommend her for her position in the group, defendants stated legitimate non-discriminatory reason why they made the recommendation. It was her relationship with Mooring, and it was plaintiff's burden then to present evidence showing that that stated reason was untrue. And here. . . No, she has to show that it's really a pretext. That's what I meant to say, Your Honor, sorry. So, you know, if Fitz, you know, digs into the record and decides to hold her responsible for these weasels, who have a website, by the way. They do. They seem pretty harmless, actually, from the website. But it's hard to see that when they didn't hold other far worse things in terms of associations against Kraft, you know, you have a bit of a double standard problem. Well, Kraft, there's a couple reasons why plaintiff and Kraft are not substantially similar. First is, well, plaintiff talks about Kraft didn't pass his background investigation. But I'm just saying at the micro level of association concerns, she gets dinged for her association with Mooring, whereas Kraft does not get dinged for his association with a bunch of people with criminal records. Well, there are a lot of differences between those associations. First of all, her association with Mooring occurred during. . . It was a voluntary choice to go on this trip with Mooring. It occurred during the application process, and it occurred while Mooring was presently known to be associated with the weasels. So whereas Kraft, on the other hand, his, you know, criminal incident had been three years earlier of pushing over somebody's run-down garage who was next door. He didn't choose to associate with any, you know, with his father or sister. And in those circumstances, his father and sister had been arrested as teenagers, and he hadn't seen his brother in over four years. So there are some serious differences between the problems raised by Mooring and the problems raised by Kraft's background, insofar as the Mooring incident was current and voluntary. And so the question is, are you describing the kind of thing that a district court judge should just decide for him or herself, or are you describing the kinds of things a jury ought to decide? These are issues that are correctly resolved on summary judgment because there's no evidence that defendants didn't honestly believe that Mooring was a problem. There's these big differences between Kraft and Mooring. As Your Honor mentioned earlier, plaintiff applied in the immediate aftermath of Kraft's arrest. And then they forget. Then they have amnesia, right, because then when they have the next round, they're back to business as usual. Well, but there's no evidence that notes here presented any similar sort of differences. And to the extent that plaintiff argues that Kraft didn't pass the background investigation, while plaintiff did, at the time the background investigation occurred, nobody knew about plaintiff's relationship with Mooring. So to try and compare one background investigation to the other overlooks the fact that the critical reason why defendants chose to recommend against her application had not yet come to light. And so that really can't be used as a comparator in terms of different behavior. All right. Thank you very much. Thank you. Anything further, Mr. Baker? Just very briefly, and I won't go back over the arguments that I made before. The question of the adverse employment action and the pay, and I think that this is significant as to why it's not in the record. It's not in the record because initially when they moved for summary judgment, their argument was it was a small amount of money that was a difference, and that wasn't significant to constitute an adverse employment action. They didn't say there was no amount of money. So that's in their motion. So because they made that statement, we didn't put the documentation that would be the collective bargaining agreement showing what the raises would be because to us they didn't really argue that point, and therefore whether it's waived or not, that's why it wasn't. So anyway, I would ask that the court reverse the grant of summary judgment and thank everyone. All right. Thank you very much. Thanks to both counsel. We'll take the case under.